IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PENNECO PIPELINE CORPORATION and PENNECO OIL COMPANY, INC., <br><br> *Plaintiffs*, <br><br> v. <br><br> K. PETROLEUM, INC., <br><br> *Defendant*. | Civil Action No. 2:18-cv-248 <br><br> Hon. William S. Stickman IV |

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND AWARD

WILLIAM S. STICKMAN IV, District Judge

On November 18, 2019, the Court entered a Memorandum Opinion which granted summary judgment in favor of Plaintiffs Penneco Pipeline Corp. and Penneco Oil Co., Inc. ("Plaintiffs" or, collectively, "Penneco") and against Defendant K. Petroleum, Inc., ("KPI") on liability for Penneco's breach of contract claims. (ECF No. 94). The Court ordered a trial on damages. After the parties elected to a proceed without a jury, the Court heard testimony on August 26 and 27, 2020. (ECF Nos. 162 and 163). Both parties offered post-trial submissions that included proposed findings of fact and conclusions of law (ECF Nos. 166-169).

AND NOW, the Court hereby finds and concludes as follows:

**BACKGROUND**

1) On May 8, 2006, Penneco and Mountain V. Oil & Gas Co. ("Mountain V") entered a Farmout Agreement wherein Mountain V agreed to drill natural gas wells within the Hackett Field, a region where Penneco is leasehold owner of thousands of acres of land in

Washington County, Pennsylvania. (Farmout Agreement, *generally* (ECF No. 158-2, pp. 24-33)).

2) The Farmout Agreement specified that it "shall be binding upon the parties hereto and their successors and assigns." (*Id*. at p. 26).

3) On February 23, 2007, Penneco and Mountain V entered a Drilling and Operating Agreement ("D&O Agreement"). (*Id*. at p. 1)

4) The D&O Agreement designated Mountain V as the operator of certain gas wells and of the Gathering System.

5) Section 16 of the D&O Agreement is an integration clause which provides, in material part: "[t]his Agreement, **together with Exhibits**, represents the entire understanding of the parties with respect to the subject matter hereof and supersedes and merges herein all prior negotiations, understandings, agreements and representations." (*Id*. at p. 11) (emphasis added).

6) The Farmout Agreement was attached as Exhibit B-3 to the D&O Agreement. As such, it is integrated into the D&O Agreement and made part of the overall contractual regimen between Penneco and KPI.

7) The Gathering System is a network of pipes where gas produced from the wells is gathered before being sold into a high-pressure transmission line owned and operated by Equitrans. (ECF No. 162, p. 12).

8) The gas from the Gathering System enters the Equitrans transmission line after passing through a single meter owned and operated by Equitrans. (*Id*.).

9) The Gathering System is the only avenue for gas produced in the wells subject to the D&O Agreement to be taken to market.

10) In 2012, Appalachian Conventional Production Co., formerly known as Hayden Harper Energy KA, LLC ("Hayden Harper") acquired Mountain V's interests. In 2015, Hayden Harper contracted with KPI for KPI to become the operator of the wells subject to the D&O agreement, as well as the Gathering System.

11) Later, Penneco acquired Hayden Harper's interest in the Mountain V wells and removed KPI as the operator of the wells.

12) KPI took the position that its removal as operator of the wells also served to absolve it from any responsibility as operator of the Gathering System. That position was rejected in arbitration proceedings before the American Arbitration Association ("AAA") and, later, by the Honorable David S. Cercone of this Court.

13) A deeper explanation of the factual and legal background of the proceedings before the AAA and Judge Cercone is set forth in the Court's November 18, 2019, Memorandum Opinion Granting Plaintiffs' Motion for Partial Summary Judgment. (ECF No. 94). That Memorandum Opinion is incorporated herein.

14) Because KPI has taken the position that its dismissal as operator of the wells also eliminated its responsibilities as operator of the Gathering System, it has not paid Penneco for any gas injected into the Gathering System. Nor has KPI provided Penneco with the information called for by the D&O Agreement.

15) As expressed in the Court's Opinion explaining its grant of summary judgment, the Court held that KPI's failure to pay Penneco constituted a breach of contract and that liability was established. The Court ordered a trial to assess the amount of damages owed by KPI.

16) The parties proceeded to a bench trial before the Court on August 26 and 27, 2020. (ECF Nos. 162 and 163).

**CONTRACTUAL PROVISIONS GOVERNING DAMAGES**

17) The calculation of damages in this case requires a calculation of the raw amount that KPI owes to Penneco for gas injected into the Gathering System from Penneco wells, minus any applicable deductions. The applicable contractual provisions are set forth in both the D&O Agreement and the Farmout Agreement.

18) Section 7(b) of the D&O Agreement states:

> [KPI] will disburse to [Penneco], no later than fifteen (15) business days following the end of each calendar month, the entire proceeds received by Operator during such month from the sale of natural gas and/or oil produced from the Wells operated hereunder less the amount charged to Developers under Section 6(d) and 7(a) hereof. Each such disbursement will be accompanied by a statement itemizing with respect to the Wells (i) the total production of natural gas and/or oil since the date of the last disbursement, (ii) the total proceeds received from the sale thereof, and (iii) the costs and expenses deducted from said proceeds.

(ECF No. 158-2, p. 7).

19) Relevant to this case—this provision requires KPI to pay Penneco for gas produced by its wells and injected into the Gathering System, minus specified deductions set forth at Section 6(d) and 7(a) of the D&O Agreement. The payment is to be accompanied by an itemized statement showing the amount of gas produced, the proceeds received from the sale of the gas and applicable costs and deductions.

20) KPI has neither claimed, nor adduced evidence of, deductions under Section 6(d) or 7(a) of the D&O Agreement. However, there are applicable deductions that are governed by that Agreement and the Farmout Agreement.

21) Beyond the Section 6(d) and 7(a) deductions identified in Section 7(b), the contractual documents provide for other deductions.

22) The D&O Agreement specifically incorporates the Farmout Agreement. Section 6 of the Farmout Agreement provides for deductions for use Penneco's use of the Gathering System, as well as documented costs associated with that use:

> [KPI], hereby gives Penneco the right to market gas through [KPI's] pipelines, for wells drilled by Penneco, on the leases listed as Exhibit "A", for the sum of 15₵ per MCF (1,000 cubic feet). In addition, Penneco shall pay for the documented cost of compression, charts and integration, if applicable. All gas will be allocated at the master meter.

(ECF No. 158-2, p. 25).

23) Further, Section 4(e) of the D&O Agreement provides, in relevant part, for sharing the cost of the operation and maintenance of the compressor on the Gathering System:

> The cost of operation and maintenance of the compressor shall be shared among all wells producing into the compressor pro-rata according to the total volume of gas sold via compression.

(ECF No. 158-2, p. 5).

24) The parties contractual provisions clearly spell out how Penneco was to be paid—it was to receive compensation on a monthly basis for gas produced by its wells, minus deductions for the specific costs and expenses set forth in the contractual provisions. Moreover, Section 7(b) of the D&O Agreement imposed upon KPI the responsibility for providing documentation verifying all of the variables that went into calculating the amount Penneco was owed.

25) The calculation of damages in this case should be easy—a function of simple arithmetic to be conducted after looking at the records provided by KPI pursuant to Section 7(b) of the D&O Agreement. It has been made complicated, however, because KPI failed not only to make payments that were due, but to share the information with Penneco relating to the sale of gas and relevant deduction.

26) KPI's President, Jam Khorrami, testified that KPI never provided the information:

> Q. You acknowledge owner distribution statements have not been issued since April of 2017 through the present. Correct?
>
> A. Absolutely correct.
>
> Q. You acknowledged, when we met for your personal deposition, that Penneco has, in fact, requested the distribution statements on several occasions from KPI?
>
> A. Correct.

(ECF No. 160, p. 6; ECF No. 152-2, p. 14). Indeed, Mr. Khorrami admitted that he "personally gave the order not to issue any statement." (ECF No. 160, p. 3; ECF No. 152-1, p. 48).

27) Although Section 7(d) of the D&O Agreement obligates KPI to provide financial and other information to Penneco upon request, KPI admitted that it chose not to do so:

> Q. You have been requested—excuse me. KPI has been requested for some time to provide certain information such as owner distribution statements to Penneco; isn't that true?
>
> A. Yes, it is.
>
> Q. And in each instance, KPI has refused to do so?
>
> A. That is true as well.

(ECF No. 160, p. 4; ECF No. 152-1, p. 92).

**PENNECO'S EXHIBIT 5**

28) Because KPI refused to produce the information designated by the contractual documents Penneco was required to look to other supporting evidence to support its request for damages.

29) It produced a spreadsheet, admitted as Exhibit 5, summarizing the evidence that it used to calculate the damages that it is owed.

6

30) KPI objects to some, but not all, of the elements of Penneco's damage calculation. Indeed, it agrees with Penneco on certain key variables of its calculations. It offered its own spreadsheet which proffers an alternative calculation of many of the elements of Penneco's damages claim, Exhibit 51/51A.[1]

31) Having listened to the testimony of witnesses from Penneco and KPI and having reviewed all of the supporting evidence relating to damages, the Court holds that Penneco has adduced adequate evidence to support an award of damages. Moreover, for the reasons set forth below, the Court holds that most, but not all, of the specific calculations set forth in Penneco's Exhibit 5 are credible, accurate and accepted by the Court.

32) On the converse, the Court does not believe that KPI's alternate spreadsheet containing its calculation of Penneco's damages is credible and reliable.

---

[1] KPI initially submitted proposed Exhibit 51, which was a spreadsheet outlining its own position on the damages owed to Penneco. During trial, KPI submitted an amended version of Exhibit 51, labelled Exhibit 51A. Penneco filed a Motion to Strike KPI's Proposed Trial Exhibit 51A (ECF No. 154) because it was not disclosed to Penneco until the eve of trial and contained information that was allegedly responsive to discovery requests that Penneco had previously served upon KPI, that KPI had not responded to and to which KPI had represented that it had no responsive information. In fact, The Honorable Peter J. Phipps (prior to the reassignment of the case to this judge) had threatened KPI with sanctions to the extent that it withheld responsive material. Faced with the Motion to Strike, KPI chose not to offer proposed Exhibit 51A. (ECF No. 163, pp. 2-3). Later, when KPI attempted to use the previously exchanged as "original" Exhibit 51, Penneco objected and moved to strike the proposed exhibit. (ECF No. 163, p. 121). Penneco correctly argued that KPI's Exhibit 51 included a method of calculating damages that was unsupported by the parties' contractual regimen and that the Court had already excluded in its Omnibus Order on Motions in Limine (ECF No. 139, pp. 1-2). Thus, both versions of proposed Exhibit 51/51A submitted by KPI included inadmissible or otherwise problematic variables in violation of prior orders of Court.
After conferring with counsel and solely for the purpose of summarizing evidence and aiding testimony in the bench trial, the Court permitted KPI to use the non-objectionable portions of Exhibit 51A (which did not include the previously excluded method of damages calculation). (ECF No. 163, pp. 128-131). Ultimately, having considered the document in light of the testimony and exhibits, the Court does not find it to be credible and reliable. On the contrary, having weighed the record as a whole, the Court finds that Penneco's calculations, summarized in Exhibit 5, are more reliable and credits them over the alternatives proposed in KPI's exhibit.

33) The first set of variables that the Court must consider in formulating a damages award compensating Penneco for the amount of gas sold is the total volume of gas and, after that number is established, the share of that gas attributable to Penneco and KPI wells, respectively.

34) The volumes attributable to KPI (column a on Exhibit 5) are not in dispute. Marie Logothetis, Vice President of Operations and Geophysicist of KPI, testified that she agreed with the numbers that Penneco includes in column a of Exhibit 5. (ECF No. 163, pp. 168, 172).

35) The volumes in column a are taken from the monthly Gas Analytical Services ("Gas Analytical") reports. An example of the monthly Gas Analytical report for KPI's wells for April 2017 was offered and admitted into the record without objection as Exhibit 7.

36) By way of background, Gas Analytical is a third-party integrator that prepares volume calculations for all of the wells at issue. It is nationally known and is the largest integration company in the country. To summarize its role, Gas Analytical provides clients with monthly reports of the volumes of gas produced by gas wells. (ECF No. 162, pp. 21-22).

37) Gas Analytical provided reports to both Penneco and KPI reflecting the volumes produced by their respective wells. The monthly Gas Analytical reports for the wells at issue were admitted into evidence as Exhibits 44 and 45.

38) The next variable is the total amount of gas produced by Penneco's wells. Penneco offered an example of Gas Analytical reports for its wells for April 2017 as Exhibit 6. This exhibit corresponded to Exhibit 7, addressing KPI's wells. Penneco offered Exhibit 43, which included all of the Gas Analytical monthly reports for wells in the field. KPI objected to the example offered as Exhibit 6 and the total body of reports offered as Exhibit 43. Curiously, while KPI agreed that the Gas Analytical reports covering its wells were accurate and reliable—it questioned the accuracy and reliability of the same type of report by the same third-party

8

analyst as to Penneco's share of the gas. The Court held that KPI's objection was specious and admitted Exhibit 6 and the supporting Exhibit 43.

39) While KPI purports to question the accuracy and reliability of the numbers in column b, it is critical to note that it does not contend whether that those numbers are inaccurate reflections of the numbers represented in the Gas Analytical reports. (ECF No. 163, p. 176). KPI's only question is whether Gas Analytical accurately recorded Penneco well volumes. In other words, KPI does not accuse Penneco of misrepresenting the Gas Analytical reports for its wells, but argues that Penneco has failed to prove that the volumes reflected on the reports were accurately calculated by Gas Analytical.

40) KPI also contends that Penneco's volumes are inaccurate because it records volume every month even though it admits to "shutting in," or turning off, wells throughout the time in controversy.

41) Column b shows that there are three periods (April-June 2017, March-September 2018, and November 2019-April 2020) where Penneco's volumes are drastically decreased from other periods. However, Penneco still records *some* volume of gas for each of these periods. KPI contends that Penneco's volume for the shut-in months should be zero.

42) Ben Wallace, the Chief Operating Officer of Penneco, explained that even during shut-in months there was always some gas flowing. This is because not all of its wells were turned off and some gas was required to flow in order to maintain pressure in the pipeline. He explained: "[w]e were concerned that if we shut every well, if we physically turned off every well, it may negatively impact some of the landowners in the field. So during the shut-in periods, we left on a hand full of wells to maintain pressure in the pipeline." (ECF No. 162, pp.

51-53). He further clarified that during a shut-in period "[s]ome of the wells are 100 percent shut-in, but all the wells are not shut-in." (*Id.* at p. 146).

43) Having reviewed and weighed all of the testimony and exhibits, the Court finds Mr. Wallace's explanation to be credible and well supported by the record. Conversely, KPI's contention that no volume is attributable to Penneco during the shut-in periods is not premised on credible evidence. Nor does the attribution of such volumes to Penneco cast doubt on the integrity of its damages calculation.

44) The Court finds no merit to KPI's objection to the totals set forth at column b. In light of KPI's reliance on reports from the same third party as used by Penneco—Gas Analytical—the Court finds the objection to the accuracy of those reports as to the volumes of Penneco's wells to be specious, at best. Nor does the Court accept KPI's argument that the volumes claimed by Penneco during shut-in months are inaccurate or show unreliable calculations.

45) The Court finds that the evidence of Penneco's total production set forth in reports admitted as Exhibit 43 and summarized at columns a and b of Exhibit 5 are credible and uses those totals as a foundation for its damages award.

46) The total amount of gas produced from the Penneco and KPI wells in the Hackett Field is calculated by adding the volume of Penneco gas to the volume of KPI gas. This total is represented at column c of Exhibit 5. Having listened to the testimony and reviewed the exhibits, the Court finds that the calculation of totals set forth in column c is credible and accurate and may be relied upon in the calculation of damages.

47) According to production records offered into evidence by Penneco, Penneco has documented and established that 798,671 Mcf of gas was produced by the combined Penneco/KPI wells in the period at issue and for which Penneco offered evidence.

48) Based on the month by month volumes of Penneco's and KPI's gas that was produced, Penneco calculated the relative percentage of each producer's gas in the total monthly production. This percentage calculation is necessary to calculate the pro-rata share of the payment for the gas due to each producer. The calculations of monthly percentages for KPI's and Penneco's respective productions are set forth at columns d and e of Exhibit 5. The Court finds that those columns are credible and accurate.

### GAS SOLD AND LINE LOSS

49) The next variable to consider is the amount of gas that passed through the Equitrans meter—which is the contractual point of sale.

50) The total amount that passed through the Equitrans meter was 666,244 Mcf.

51) The parties agree that the amount of gas passing through the Equitrans meter is not the same as the aggregate amount produced by each well. Rather, some amount of gas is lost in transmission through the gathering system. This loss is called line loss. Line loss is caused by various factors, such as leaks in the infrastructure, the gas used to fuel compressor, and house gas. Line loss is calculated by subtracting the amount of gas passing through the Equitrans meter from the total amount of gas produced by the combined KPI/Penneco wells. The total line loss must be divided pro-rata between KPI and Penneco according to their percentage share of overall production.

52) KPI and Penneco dispute the amount of line loss.

53) Ultimately, the amount of line loss is not directly relevant to the calculation of damages owed to Penneco because Penneco is only seeking payment for gas that actually passed through the Equitrans meter. However, KPI seems to suggest that Penneco's allegedly inaccurate calculation of line loss is indicative of an overall failure to proffer accurate calculations supporting its damages analysis.

54) As the Court explained above, Penneco has established that the total amount of gas produced by Penneco and KPI was 798,671 Mcf. The total amount that passed through the Equitrans meter was 666,244 Mcf. Thus, Penneco's evidence shows a total line loss of 132,427 McF. This amounts to approximately 19.8% of the total production.[2]

55) KPI contended that the amount of line loss presupposed by Penneco's calculations far exceeds what is normally encountered in the industry and evidences problems—indeed, a lack of credibility—in the damages calculations. Penneco countered that the amount of line loss is supported both by industry experience and record evidence relating to the specific gas infrastructure in the Hackett Field.

56) The Court has examined and weighed the conflicting testimony about Penneco's calculation of line loss and finds Penneco's position is credible and well supported by the record.

57) As explained above, the amount of line loss is not directly relevant to the calculation of damages due to Penneco because that calculation is based on amounts of gas that actually passed through the meter. The Court finds that the claimed line loss does not impugn the accuracy of Penneco's damages calculation.

---

[2] This line loss aggregate does not mean, however, that line loss totaled 19.8% each and every month. The record evidence demonstrates that the actual monthly total fluctuated.

**PRICE**

58) The price of gas and amount that KPI received for the gas is not difficult to compute and is not in dispute.

59) The parties stipulated to the admissibility of Exhibit 16, which is a summary of the prevailing Inside FERC DTI Index Monthly Price for gas for the period spanning April of 2017 through May of 2020.

60) Exhibit 13 is the Master Gas Contract governing KPI's sale of gas produced in the Hackett Field.

61) Section 4 of the Master Gas Contract specifies that KPI would be paid the price "specified in the Confirmation."

62) Exhibit 14 is a collection of Dominion Field Services Confirmations (as referenced in Section 4 of the Master Gas Contract).

63) The Price term in the Confirmation specifies: "100% Inside FERC Gas Market Report (Dominion Transmission Inc. Appalachia) plus $0.055 per MCF."

64) The Court finds that Penneco's undisputed calculation of the price to be paid to KPI for the sale of gas from the Hackett Field, the FERC market price plus $0.055 cents/MCF, was credible and well-supported by the evidence.

**TOTAL PRE-DEDUCTION AMOUNT OWED TO PENNECO**

65) The Court finds that the calculations set forth in columns a through m at Exhibit 5 are accurate, credible and reliable.

66) As expressed through the calculations at Exhibit 5, the total pre-deduction share of gas payments received by KPI and attributable to Penneco was **$569,113.38**.

67) Penneco's damages award is calculated by subtracting permitted deductions from this total.

**COMPRESSOR DEDUCTIONS**

68) As set forth above, Section 6 of the Farmout Agreement provides for deductions for use Penneco's use of the Gathering System, as well as documented costs associated with that use, which include "the documented cost of compression." (ECF No. 158-2, p. 25).

69) It is undisputed that any deduction for cost of compression must be "documented." (ECF No. 169, ¶103; ECF No. 166, ¶103).

70) KPI rented a compressor from USA Compression. Column n of Exhibit 5 sets forth the monthly compressor rental fees. The amounts set forth in column n are not in dispute. (ECF No. 169, ¶105).

71) Column o of Exhibit 5 sets forth the only oil expense invoices that KPI documented for the compressors on the Hackett Field. The sums in column o are not disputed. (ECF No. 169, ¶106).

72) There is a dispute between Penneco and KPI as to in which month KPI paid for the cost of replacing the compressor and, consequently in which month the expenses should be allocated for the determination of the parties' respective shares in the expenses. (ECF No. 166, ¶¶107-110; ECF No. 169, ¶¶107-110). Having reviewed the evidence, particularly the competing testimony of Mr. Wallace and Ms. Logothetis, the Court finds Penneco's accounting and explanation to be more credible and will, therefore, accept the allocation of the compressor replacement expenses as set forth in column p of Exhibit 5.

73) Column q of Exhibit 5 is simply a calculation of the total compression-related expenses and is not in dispute. (ECF No. 166, ¶112; ECF No. 169, ¶112). The total documented

compression expenses incurred by the joint KPI/Penneco operations on the Hackett Field were $330,416.68.

74) Under Section 6 of the Farmout Agreement, Penneco and KPI are responsible for their pro-rata share of compression expenses. Column r of Exhibit 5 sets forth Penneco's calculation of its pro-rata share of compression related expenses.

75) Penneco calculated its pro-rata share of compression expenses in the same manner in which it calculated its pro-rata share of monthly production, by comparing the relative production of Penneco and KPI wells for each production month.

76) While, as addressed above, KPI disputes Penneco's calculation of its monthly pro-rata share of gas, the Court found that calculation credible and accurate. It, likewise, finds the calculations set forth at column r of Exhibit 5 are credible and accurate.

77) Thus, Penneco's share of the total compression related expenses, $330,416.68, is **$84,307.54**.

**KPI MARKETING AND TRANSPORT FEE**

78) There is no dispute that under Section 6 of the Farmout Agreement, KPI is entitled to deduct "the sum of 15¢ per MCF" from amounts owed to Penneco.

79) This deduction is taken from the volume of Penneco's gas sold at the Equitrans master meter. This point is not in dispute. (ECF No. 169, ¶116).

80) Penneco calculated the total amount of the deduction by multiplying the amount of its gas that passed through the meter by 0.15 and arrived at the sum of **$38,349.63**.

81) KPI disagrees with this calculation because, as explained above, it disagrees with Penneco's calculation of the amount of gas that it produced and its pro-rata share of gas sold. As explained above, the Court determined that Penneco's calculations are credible and accurate.

Therefore, it accepts the calculation of $38,349.63 as the appropriate total deduction that KPI is permitted to take from Penneco's share of gas revenue under Section 6 of the Farmout Agreement.

### TOTAL VOLUME RELATED DAMAGES

82) The Court finds that a raw total of $569,113.38 in gas revenue is attributable to Penneco. From this amount, KPI may deduct $84,307.55 for compression expenses and $38,349.63 as a function of the 15¢ per MCF deduction authorized by Section 6 of the Farmout Agreement. These sums, added together, amount to $122,657.17 of deductions.

83) Subtracting the $122,657.17 from the $569,113.38 leaves a total of **$446,456.20** as the base amount due to Penneco.

### INTEREST

84) Penneco and KPI dispute whether KPI owes interest on unpaid sums due to Penneco.

85) Penneco argues that it is entitled to interest pursuant to the terms of Section 15 of the Farmout Agreement, which provides:

> If Operator fails to meet the drilling commitment set forth in Paragraph 2 hereunder, or if Operator fails to make any payments required hereunder, or otherwise breaches this Agreement, any or all of the Operator's rights under this Agreement will automatically terminate as to any or all undeveloped acreage. Any sums of money owed by Operator to Penneco, the payment of which is delinquent under this Agreement, shall be paid with interest at prime (as declared from time to time by PNC Bank, N.A.) plus four (4%) percent for the period of delinquency.

(ECF No. 158-2, p. 27).

86) KPI counters that Section 7(b) of the D&O Agreement, which this Court found KPI to have breached, includes no language that would entitle Penneco to interest. Nor, does the D&O Agreement, as a whole. KPI contends that the interest provisions of Section 15 of the

16

Farmout Agreement applies only to violations of the Farmout Agreement itself and cannot be applied to a breach of the D&O Agreement. KPI argues that "the only circumstances in which interest is owed under the Farmout Agreement is where such payments were required specifically under the terms of the Farmout Agreement." In other words, KPI disputes that its breach of its payment obligations under the D&O Agreement may give rise to an interest award under Section 15 of the Farmout Agreement. (ECF No. 169, ¶150).

87) The preamble to the D&O Agreement specifically incorporates the terms of the Farmout Agreement: "WHEREAS, Operator has acquired certain rights […] which rights were acquired by Operator by virtue of certain documents summarized in Exhibit "B" attached hereto ***and made a part hereof*** (all of which documents are herein referred to as the "Documents") […]." (ECF No. 158-2, p. 1) (emphasis added). The Farmout Agreement is attached as Exhibit B-3 of the Drilling and Operating Agreement. Section 3(b)(iv) of the D&O Agreement further mandates that "***[KPI] will comply with all terms and conditions of the Documents***." (*Id.* at p. 3) (emphasis added). Finally, the integration clause of the D&O Agreement integrates the provisions of the Farmout Agreement with the D&) Agreement. (*Id.* at p. 11).

88) There can be no question that the Farmout Agreement is included in the parties' contractual regimen and is relevant to the claims in this matter. Critically, for example, KPI does not dispute that Penneco owes the 15₵ per MCF deduction and the costs of compression, which are authorized by Section 6 of the Farmout Agreement but which is not specifically set out in the D&O Agreement itself.

89) The Farmout Agreement is integrated into the D&O Agreement and KPI is required, under section 3(b)(iv) of the D&O Agreement to adhere to "all terms and conditions" of the Farmout Agreement. (ECF No. 158-2, p. 3).

17

90) The terms of the Farmout Agreement and the D&O Agreement are inextricably intertwined. The parties agree, for example, that it is not possible for the Court to formulate a damages award without looking to provisions of both documents. Moreover, the terms of Section 6 of the Farmout Agreement which provide for certain *deductions* that KPI may take clearly and necessarily presuppose a *payment* owed to Penneco from which the deductions are taken. (ECF No. 158-2, p. 25). As such, the payments that KPI did not make to Penneco are unquestionably payments "hereunder" [i.e., the Farmout Agreement] and "breaches [of] this Agreement." (ECF No. 158-2, p. 27). They are, likewise, sums that are "delinquent under this Agreement." (*Id.*). The contractual interest is owed.

91) Having determined that KPI owes interest for the delinquent sums, the Court finds that Penneco's calculation of interest set forth at columns w through y of Exhibit 5 are accurate and credible and awards **$64,835.95** of interest to Penneco.

**SHUT IN ROYALTIES**

92) The final amount claimed by Penneco is $16,512.00 of damages representing shut-in royalties that Penneco paid to landowners.

93) Mr. Wallace explained that because Penneco was not being paid by KPI for gas being produced and sold, it was precluded from making the required royalty payments to landowners on whose land its wells were located. (ECF No. 162, pp. 72-75).

94) He testified that in order to avoid any liability to the landowners for failure to provide royalties, it chose to pay annual shut in payments to the landowners pursuant to the terms of their leases. (*Id.*).

95) In total, Penneco submits that it paid $16,512.00 in shut-in royalties to its customers.

96) KPI counters that Penneco voluntarily paid the shut-in royalties and, therefore, they are not recoverable.

97) The Court has reviewed Mr. Wallace's testimony and the documents that Penneco has adduced in support of shut-in royalties (which were admitted as Exhibit 19).

98) The Court finds that the evidence supports a finding that Penneco, as Mr. Wallace testified, made the determination to pay certain landowners in order to avoid any potential issues stemming from non-payment which, Penneco claims was precipitated by KPI's breach.

99) However, based on the evidence that was submitted to the Court, it finds that Penneco's decision to make those payments was made voluntarily and was, ultimately, a business decision.

100) Penneco has not met its burden of proof in showing that the payments were required by its leases.[3] Nor has Penneco demonstrated that they are recoverable under the D&O Agreement or the Farmout Agreement.

101) The Court finds that the record does not support awarding of damages relating to shut-in royalties.

---

[3] Penneco never offered the leases into evidence. Footnote 9 of Penneco's Reply to Defendant's Post-trial Findings of Fact and Conclusions of Law (ECF No. 168) accurately points out that KPI's attorney acknowledged that the leases were produced in discovery and that KPI intended to email the leases to the Court for use at trial. Ultimately, however, KPI never introduced the leases. It was not KPI's burden to do so. Penneco has not introduced the leases into evidence.

CONCLUSION

102) For the reasons set forth above, the Court awards the following damages to Penneco:

- Breach of Contract Damages :   $446,456.20
- Interest:   $64,835.95
- **TOTAL:**   **$511,292.15**

BY THE COURT:

_/s/ Will S Stickman IV_
WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

_January 13, 2021_
Dated

20